**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

| | |
|---|---|
| **IN RE: DENNY ZULPO AND** | **Case No. 4:16-bk-15850J** |
| **PAMELA ZULPO,** | **(Chapter 7)** |
| **Debtors.** | |

| | |
|---|---|
| **BRUCE DANTZLER AND** | **PLAINTIFFS** |
| **LINDA DANTZLER** | |
| **VS.**      **AP No. 4:17-ap-1039** | |
| **DENNY ZULPO AND** | |
| **PAMELA ZULPO** | **DEFENDANTS** |

## MEMORANDUM OPINION

Before the Court is the Complaint filed by Bruce and Linda Dantzler ("**Dantzlers**") objecting to the discharge of Denny and Pamela Zulpo, who are joint debtors in this voluntary Chapter 7 bankruptcy case ("**Debtors**"). The Debtors timely answered the complaint.

The Dantzlers base their objection to the Debtors' discharge on three provisions of Section 727 of Title 11 of the United States Bankruptcy Code: Section 727(a)(3) (failing to keep or preserve recorded information from which the debtor's financial condition might be ascertained); Section 727(a)(2)(A) and (B) (transferring property with intent to hinder, delay, or defraud creditors); and Section 727(a)(4)(A) (knowingly making false oaths in connection with the bankruptcy case).

After a trial on the merits on January 8, 2018, the Court took the matter under advisement. For the reasons stated in the following Memorandum Opinion, the Debtors' discharge is denied.

## I.  Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1334.  The matter before the Court is a core proceeding under 28 U.S.C. § 157(b)(2)(J), and the Court may enter a final order.  The parties have expressly consented to the entry of a final order by this Court on all claims and causes of action asserted in this adversary proceeding.  (Agreed Pre-Trial Order, Doc. No. 11). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.  Background

The Debtors are stone masons by occupation, but also provide lawn care and handyman services when the opportunity for such work presents itself.  The two have been married since 2008.  Mrs. Zulpo did not graduate from high school but has earned a graduate equivalency degree.  Mr. Zulpo's education is not shown by the record.

In 1995, Mr. Zulpo was involved in a head-on collision with an all-terrain vehicle and suffered a brain injury as a result.  Mr. Zulpo testified that the accident initially left him with paralysis on his right side, but that disability gradually subsided.  However, he also suffered an impaired memory which persists, and as a result his recall of recent events is sometimes faulty.

Prior to bankruptcy, Bruce and Linda Dantzler, the plaintiffs in this adversary proceeding, hired the Zulpos to complete a series of stone-work projects at their home over a period of several months in 2012.  Mr. Dantzler testified that a year after completion of the various projects, the mortar in some areas began to crumble.  He contacted the Zulpos, who offered to patch the affected areas, but Mr. Dantzler was dissatisfied with their proposed solution and ultimately filed suit against the Zulpos in 2014 in the Pulaski County Circuit Court ("**State Court Lawsuit**").

2

After a trial on the merits of the State Court Lawsuit on June 8, 2016, the Dantzlers were awarded a judgment against the Zulpos for $41,075.31, which included $29,500.00 for payments the Dantzlers made to the Zulpos for their work, as well as other costs and fees.  (Ex. 1).[1]   After entry of the judgment on July 12, 2016, the Zulpos each submitted a schedule of assets (the "**Schedule of Assets**" or collectively, the "**Schedules of Assets**") as required by the circuit court.[2]  (Ex. 2).  In a subsequent order entered October 17, 2016, the circuit court questioned the completeness and veracity of the Zulpos' State Court Schedules of Assets and ordered them to supplement the schedules within twenty days.  (Ex. 43).  The State Court Schedules of Assets will be more fully discussed in a subsequent portion of this Opinion.

The Zulpos did not amend their State Court Schedules of Assets as directed by the circuit court.  Instead, on November 3, 2016, they filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.  (Ex. 3).  On March 31, 2017, the Dantzlers filed the instant adversary proceeding objecting to the Debtors' discharge.  (Ex. 8).

### III.  Burden of Proof

The Dantzlers, as the individuals objecting to the Debtors' discharge under Section 727 bear the burden of proving by a preponderance of the evidence that discharge should be denied. *Retz v. Samson (In re Retz),* 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007)).

Denial of a debtor's discharge has been described as "a harsh remedy," and, consequently, the provisions governing discharge denial "'are strictly construed in favor of the

---

[1] All references to exhibits are to the plaintiffs' exhibits introduced at trial.  No exhibits were introduced by the defendants.

[2] Each of the Debtors submitted his or her separate Schedule of Assets verified before a Notary Public on October 11, 2016, and filed with the clerk of court.  (Ex. 2).

debtor.'" *Kaler v. Charles (In re Charles)*, 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012) (quoting *Korte v. Internal Revenue Serv. (In re Korte),* 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)).

### IV.  Section 727(a)(3) – Failure to Keep Records

The Dantzlers argue that they have requested certain documents and other recorded information from which the Debtors' financial condition or business transactions might be ascertained but that these materials have not been produced.  They further contend that such failure is unjustified, prevents the Debtors' creditors from understanding the Debtors' finances and business transactions, and is a basis to deny their discharge.

The Debtors acknowledged during the trial that they have made errors in their bankruptcy filings and that they are not good record keepers, but they argue that they did not purposely hide or conceal records from their creditors.  Their attorney argued on their behalf that they are terrible business people but not terrible people and should not lose their discharge for lack of sophistication or education.

The relevant statute provides that a debtor's discharge will be denied if "the debtor has . . . failed to keep or preserve . . . any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified . . . ." 11 U.S.C. § 727(a)(3) (2012).

Section 727(a)(3) does not impose an element of intent in failing to provide adequate records.  *Floret, L.L.C. v. Sendecky (In re Sendecky),* 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002); *St. Francis Cnty. Farmers Ass'n v. Wright (In re Wright),* 353 B.R. 627, 649 (Bankr. E.D. Ark. 2006) (citing *Norwest Bank Minn. v. Pulos (In re Pulos),* 168 B.R. 682 (Bankr. D. Minn. 1994) and *First State Bank of Newport v. Beshears (In re Beshears),* 196 B.R. 468 (Bankr. E.D. Ark. 1996)).  Rather, the standard under this provision is one of reasonableness. *Davis v. Wolfe (In re*

4

*Wolfe)*, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999).  Accordingly, the debtor is required "to take

such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn

what he did with his estate." *In re Wright*, 353 B.R. at 649 (quoting *In re Beshears,* 196 B.R. at

474).

Creditors must be provided with enough information to track a debtor's financial dealings

with substantial completeness and accuracy for a reasonable period leading up to the bankruptcy

filing.  *Grau Contractors, Inc. v. Pierce (In re Pierce),* 287 B.R. 457, 461 (Bankr. E.D. Mo.

2002) (citing *In re Juzwiak,* 89 F.3d 424, 427 (7th Cir. 1990)).

The party objecting to discharge under Section 727(a)(3) has the initial burden of

demonstrating that "the debtor failed to keep and preserve his financial records and that this

failure prevented the party from ascertaining the debtor's financial condition." *In re Wright,* 353

B.R. at 649 (citing *Womble v. Pher Partners (In re Womble),* 108 F. App'x 993 (5th Cir. 2004)).

If the party objecting to discharge establishes that the debtor's records are inadequate, the burden

of production shifts to the debtor "to offer a justification for his record keeping (or lack

thereof)." *McDermott v. Swanson (In re Swanson),* 476 B.R. 236 (B.A.P. 8th Cir. 2012) (debtor

must show that his record keeping was reasonable under the circumstances).

### (A)  Adequacy of the Records Produced

The first issue to resolve is whether the Dantzlers established an inadequacy of the

Debtors' records such that the Debtors' present financial condition and business transactions for

a reasonable period in the past cannot be ascertained.  In making this determination, the Court

considered evidence of the Debtors' business income as reflected on their federal and state

income tax returns for the years 2012 through 2016, the schedules and statements filed in the

bankruptcy case, their bank statements, and their records of cash receipts and disbursements

related to their business.  Also relevant to the Court's determination were the Dantzlers' records of their payments to the Debtors for stone masonry work performed in 2012.

### (1) 2016 Tax Returns

The Debtors' 2016 federal income tax return reflects that the Debtors' only income in 2016 was business income.  (Ex. 24).  The return includes Schedule C - Profit or Loss from Business - showing gross receipts and sales of $13,858.00, cost of goods sold of $3,100.00, gross profit of $10,758.00, and other business expenses including automobile expenses, insurance, repairs, and cell phone costs totaling $7,361.00.  (Ex. 24).  The Debtors' resulting net business income after subtracting the various business expenses was $3,397.00.  (Ex. 24).  The Debtors' 2016 state income tax return reflects identical numbers for gross and net business income. (Ex. 24).

Both returns were prepared by a tax preparer.  The returns are not dated but presumably were filed after the Debtors' bankruptcy filing on November 3, 2016.

### (2) Bankruptcy Schedules and Statements

The 2016 tax returns are inconsistent with Schedule I of the Debtors' bankruptcy schedules and their Statement of Financial Affairs.  On Schedule I, filed on November 8, 2016, the Debtors' net monthly income is listed as $3,436.96, which calculates to $41,243.52 a year in *net* income.  (Ex. 5 at 24).[3]  By contrast, the Debtors' Statement of Financial Affairs listed $32,000.00 in *gross* income for January 1, 2016 to the petition filing on November 3, 2016.

---

[3] The Debtors also disclosed their current monthly income on Forms 122A-1 & A-2 ("**Means Test**").  (Ex. 6).  The documents show average net monthly income of $4,136.96.  (Ex. 6).  A note in Schedule I explains that the income determined by the Means Test differed from that in Schedule I, which more closely reflected a twelve month average while the Means Test was based on a six month average with significantly greater income than normal in one particular month.  This difference skewed the Means Test income calculation.  (Ex. 5 at 24).  The Court accepts this explanation as it relates to a comparison of income stated in Schedule I and the Means Test.

(Ex. 5 at 28). Neither the gross nor the net figure is remotely comparable to the gross and net income figures reported on the 2016 tax returns.

When testifying at trial about his filings in the bankruptcy case, Mr. Zulpo stated that the Schedule I income was incorrect, asserting that "I don't make money like that." (Tr. at 41). He testified that because his work is sporadic he was uncertain about what his income was at the time he filed for bankruptcy. He also admitted that "[w]e do not keep up with our receipts or what we do half the time." (Tr. at 42). Therefore, he "guesstimated" his income as stated on Schedule I. (Tr. at 93). He said the gross income amounts for the years 2014-2016 on his Statement of Financial Affairs were also guesses. Similarly, when Mr. Zulpo was questioned about the Means Test at trial, he stated that he did not recall this part of the schedules and that the numbers were inaccurate. (Tr. at 50). As of the date of the trial, the Debtors had not amended either their schedules or their 2016 tax returns to reconcile the differences between the income figures.

### (3) *Bank Accounts*

No additional light is shed on the Debtors' financial condition and business transactions by reviewing the Debtors' bank records. The Debtors provided statements and deposit slips related to a checking account at Arvest Bank and a savings account at Simmons Bank. The bank statements reflect a total of $12,195.00 in deposits into the Arvest checking account in 2016. (Ex. 42). Of that sum, only three deposits, totaling $1,100.00, were designated as check deposits on the deposit slips. (Ex. 27). The drawers of the checks are not disclosed in the statements or on the deposit slips. The remaining deposits are cash deposits without any indication of the sources of the cash. (Ex. 27).

The account debits reflect a few payments for gasoline, lumber, and hardware or rentals that could conceivably have been business-related. Four of these were payments to Hum's Hardware and Rental and Weiss Do-It-Best Lumber Company that were accounted for as business expenses under Exhibit 25, the Debtors' cash receipts and expenses. (Exs. 25, 27). However, the vast majority of the debits appear to be related to personal expenses such as groceries and sundries, utilities, restaurant meals, and entertainment. (Ex. 27).

The account does not reflect the source of the deposits and except for the four payments to Hum's and Weiss, no account debits can be definitely linked to business expenses. (Exs. 25, 27). Thus, this account provides minimal information about the Debtors' sources of income or business transactions.

Similarly, the Simmons savings account provides little useful information about the Debtors' financial condition. Statements dated March 31, May 31, June 30, September 30, and December 30, 2016, were introduced into the record. (Ex. 28). In April 2016 there was a deposit of $800.00 and in May 2016 there was a deposit of $1,300.00. (Ex. 28). Virtually all of these funds were subsequently withdrawn by ATM transactions in May and June. (Ex. 28). The ending balance on the June 30, 2016, statement was $11.84. (Ex. 28.). The ending balances on the subsequent statements were $3.16 (September) and $.00 (December). (Ex. 28). The account statements provide no information about the source of the deposits or how the withdrawn funds were used.

### (4) *Cash Receipt Books and Expenses*

In terms of reflecting the Debtors' business transactions, the most potentially useful documents admitted into evidence were copies of cash receipts verifying payments to the Debtors and the merchant receipts and invoices reflecting expenditures for materials and

8

supplies.  These records evidence income and expenses for work performed from approximately April to October 2016, the period immediately preceding the bankruptcy filing.  (Ex. 25).  Mr. Dantzler testified that these documents were all the records of work-related cash receipts and payments the Debtors supplied to them, despite the Dantzlers having requested cash receipts for the years 2012 through 2016.  (Ex. 10).

Mrs. Zulpo testified that she thought she had supplied all the cash receipt books requested, including those from 2014 and 2015.  She stated she provided several cash receipt books to her counsel's paralegal.  Only receipts from approximately seven months in 2016 were offered and admitted into evidence.  (Ex. 25).  She also testified that she keeps the books for the business, admitting that she is "very bad" at bookkeeping.  (Tr. at 176).  In collecting the cash receipt books to compile information about the Debtors' financial condition, she testified, "I had to dig through my house and look for them. . . . I went through the trucks and looked under seats and behind the seats . . . . One bill book actually . . . was all crumpled up and chewed up." (Tr. at 176).  About the missing cash receipt books, Mr. Zulpo testified, "We probably got them, we can't find them, because we lay stuff everywhere."  (Tr. at 72).

Using the cash receipts from 2016 produced by the Debtors, the Dantzlers calculated that the Debtors grossed a total of $28,104.64 during the seven-month period.  The Court's calculation was that the Debtors received $28,704.64 during the seven month period, including receipts for materials and labor but omitting balances remaining due of $650.00 charged to Winrock Grass Farm and $1,600.00 charged to David Bauman.  (Ex. 25).  After deducting the documented expenses totaling $8,739.30[4] for materials and supplies, the net income resulting for the seven month period is $19,965.34, an average monthly net income of $2,852.19.

---

[4] One of the receipts in Exhibit 25 is from Home Depot in the amount of $719.48 for a "recall."  It is unclear to the Court whether this receipt is for a business expense, or whether it is evidence of a credit given to the Debtors.  There

The gross and net figures derived from these calculations are inconsistent with the $3,436.96 net monthly income reported on Schedule I and the $32,000.00 in gross income disclosed on the Statement of Financial Affairs.  Moreover, the Debtors' cash receipts for the seven months in 2016 calculated above to be $28,704.64 greatly exceed the $13,858.00 in gross receipts reported for the entire year on the 2016 federal and state tax returns.

Mr. Zulpo attributed some of the discrepancies to overhead expenses not included in the cash receipt estimates.  He stated that when he quotes a price for a job, the quote includes the cost of labor and materials, but not gasoline and other, unspecified expenses.[5]  Mr. Zulpo said the amount left after paying expenses for materials and labor must then cover these other, unspecified expenses.  He stated that the net income figures on the schedules and forms do not reflect true net income because the unspecified expenses have not been deducted.  No business-related expenses are itemized on Schedule J.  He did not explain why these other expenses could not have been considered since the Debtors were able to later itemize $7,361.00 in such expenses on their 2016 tax return.

Mr. Dantzler testified that based on his personal observation when the Debtors worked for him in 2012, the Debtors conducted their work-related finances on a cash basis.  Mrs. Zulpo verified that until the Debtors opened a bank account in 2015, they had done business on a "strictly cash" basis.  (Tr. at 175).  Apparently, even with bank accounts, they continued to receive cash payments or convert payments to cash that they then used to pay most of their

---

was no testimony adduced at trial about the receipt.  The Court has construed the evidence in the light most favorable to the Debtors and therefore included the $719.48 in the calculation of expenses.

[5] These additional expenses appear to be reflected on Schedule C of the 2016 federal tax return and include car and truck expenses, insurance, repairs, and cell phone.  They totaled $7,361.00 in 2016.  (Ex. 24).

business expenses and possibly some personal expenses, depositing the rest in their bank account for personal use.

### (5) *Records from Previous Years*

Records from previous years establish a similar pattern of unexplained discrepancies and lack of documentation.  No cash receipt books for work performed prior to April of 2016 were introduced into the record.

On Schedule C of their 2015 tax return, the Debtors reported gross receipts of $7,167.00, the total from the Debtors' 1099 schedule showing income of $1,000.00 from Grande Maumelle Sailing Club ("**GMSC**") and $6,167.00 from Rich Mountain.  (Ex. 23).  However, the Debtors' Statement of Financial Affairs filed in the bankruptcy case shows gross income of $38,400.00 in 2015, a figure Mr. Zulpo now asserts is inaccurate.  (Ex. 5).  By contrast with the $7,167.00 in gross receipts in 2015, the Debtors' Arvest checking account for the months of March through December 2015 reflects a total of $9,389.97 in deposits for the ten-month period that the account was open.  (Ex. 26).

On Schedule C of the Debtors' 2014 tax return, gross receipts from business are listed at $1,200.00, the amount of income reflected on Form 1099.  (Ex. 22).  In contrast, the Debtors' Statement of Financial Affairs lists gross income for 2014 at $38,400.00.  (Ex 5).  Mrs. Zulpo testified that the Debtors were dealing in cash until 2015.  There are no bank records for 2014 and no other documents to enable a reconciliation of the 2014 tax return and the Statement of Financial Affairs.

The Debtors' 2013 tax return reflects total gross receipts of $7,358.00 on Schedule C, the same amount reflected on the 1099 schedule showing work performed for two parties.  (Ex. 21). No other sources of income were reported and there is no other documentation in the record to substantiate the Debtors' financial condition or business transactions.

11

Schedule C of the Debtors' 2012 tax return showed gross receipts of $2,359.00. (Ex. 20). Attached to the return is a Form 1099 reflecting income in the same amount. Mr. Dantzler, who is not listed on the Form 1099, testified that the Debtors' 2012 income reported on the tax return is "grossly understated" based on what Mr. Dantzler paid them that year. (Tr. at 127). Introduced into evidence were copies of invoices and checks for work performed by the Debtors for the Dantzlers from March 29 to December 11, 2012, in the total amount of $29,511.00. (Exs. 29, 49). The income from the Dantzler job is not reflected on the Debtors' 2012 tax return.

Although it is evident from the tax returns for 2012 to 2015, Mrs. Zulpo also admitted in her testimony that the only income the Debtors reported as income on their tax returns was income reported on 1099 forms. (Tr. at 172). She also admitted that the tax returns do not accurately reflect their gross receipts. (Tr. at 172).

**(B)  Standard of Reasonableness**

As the facts and circumstances prove, the Debtors' contradictory, incomplete, and demonstrably false records fail to meet the standard of reasonableness required by the statute. By Mr. Zulpo's own admission, income figures reflected on Schedule I, the Means Test, and the Statement of Financial Affairs are inaccurate, and, therefore, creditors cannot rely on them for information about the Debtors' financial condition. Furthermore, the schedules and statements are inconsistent with the 2016 tax returns and the tax returns themselves are contradicted by the bank statements and cash receipts and disbursement records.

The cash receipt books for seven months in 2016 show only a partial picture of what payments were made to the Debtors in 2016 and no such records were produced for a reasonable period prior to bankruptcy. Because the Debtors conducted their business transactions in cash,

they should have created some type of written record of all their expenses and disbursements but such records are either incomplete or nonexistent.

Moreover, by Mrs. Zulpo's own admission, the income reflected on the tax returns through 2016 do not accurately state the Debtors' gross receipts from their business.

For all the foregoing reasons, the Court finds that the Debtors have failed to keep and preserve adequate financial records to enable creditors to ascertain the Debtors' financial condition or business transactions.

**(C)  Justification for Inadequate Record Keeping**

The Dantzlers have met their burden to prove that the Debtors have failed to keep and preserve adequate financial records and that this failure has prevented them from ascertaining the Debtors' financial condition or business transactions.  The burden of production shifts to the Debtors "to offer a justification for [their] record keeping (or lack thereof)."  *In re Swanson,* 476 B.R. at 240 (debtor must show that his record keeping was reasonable under the circumstances).

Among the justifications offered for the Debtors' inadequate records are that their work is sporadic and that they are unsophisticated in terms of business experience.  The Court will also consider whether Mr. Zulpo's memory problems could have been a justification for bookkeeping inadequacies.

Addressing first the issue of sporadic work, the Court agrees that a small business like the one operated by the Debtors provides varying amounts of income depending on opportunities for work.  Weather is also a factor contributing to the sporadic nature of their trade.  However, the issue here is not that the Debtors' earnings vary from month to month or season to season, but rather, whether they can document such earnings.  Recognizing that operating a small business generally requires considerably more record keeping than that required of a wage earner

13

or salaried worker, the Court nevertheless concludes that the extra burden is not a justification for failure to keep adequate records.

The Court accepts the Debtors' contention that they are unsophisticated business people. However, despite their level of sophistication, they have exhibited the ability to record written documentation of their stone-work estimates, the payment draws for each job, the cost of materials for the jobs, and the overhead expenses of the business. Their failure, in part, is in not adequately preserving the records they prepared, as the statute requires. To comply with the duty to produce records, a debtor must first preserve them. *Peterson v. Scott (In re Scott),* 172 F.3d 959, 969 (7th Cir. 1999) (statute requires debtor to both "keep" and "preserve" records). Each debtor acknowledged in testimony that their cash receipt books were strewn about their residence and their trucks in a haphazard fashion. As a result, cash receipt books could only be produced for seven months in 2016.

Furthermore, despite his memory problems, Mr. Zulpo's testimony demonstrated that he is an integral part of the business and has input in preparing the estimates for each project. Mr. Zulpo also showed that he was aware of and acquiesced in Mrs. Zulpo's careless approach to bookkeeping. The Court concludes that the Debtors did not produce cash receipt books for earlier periods because they did not make the effort to preserve them, not because they are unsophisticated and not because Mr. Zulpo suffers from memory problems.

In addition, the Debtors offered no justification for the most glaring problems posed by their records: the discrepancies between the calculations derived from the cash receipt books and the 2016 tax returns. A comparison of those records indicates to this Court that the tax returns for 2016 are false. The records also reflect that the tax returns for previous years are likely false, including only the gross receipts reported on related 1099s.

The Court concludes the Debtors have offered no credible justification for their carelessness or the discrepancies between various types of records. These impediments have effectively deterred their creditors from being able to ascertain the Debtors' business transactions and financial condition. The argument that the Debtors did not purposely hide or conceal records from their creditors misses the mark as to Section 727(a)(3) because intent is not an element of this provision. The standard is whether the Debtors' record keeping was reasonable under the circumstances, and the Court determines that it was not.

For the foregoing reasons, the Dantzlers have proven that the Debtors have failed to provide records from which creditors may ascertain their financial condition and business transactions without justification. Pursuant to Section 727(a)(3), the Debtors' discharge will be denied.

### V. Section 727(a)(2)(A) & (B) – Fraudulent Transfers and Concealment

The Dantzlers allege that the Debtors have concealed or transferred property with intent to hinder, delay, or defraud creditors either within one year before the filing of the petition or after the filing of the petition. They assert that the Debtors have intentionally concealed their ownership of a black 2005 Chevrolet pickup truck bearing license number 326 UXL ("**2005 Chevrolet truck**"), or alternatively, that the Debtors failed to disclose a transfer of the vehicle with intent to hinder, delay, or defraud creditors.[6]

The Debtors' attorney argued at trial that Mrs. Zulpo purchased the 2005 Chevrolet truck at the request of her son, Quinton Richter, with his funds. Consequently, they believe they never

---

[6] They further allege that the Debtors concealed Mr. Zulpo's interest in 2.1 acres of real estate on Julio Road in Pulaski County, Arkansas. The Court finds this allegation is more properly considered under Section 727(a)(4) and will address this property in the discussion concerning false oaths.

owned the vehicle even though it was temporarily titled in the Debtors' names. Accordingly, they argue they could not have formed an intent to conceal ownership.

The applicable provisions are subparts (A) and (B) to Section 727(a)(2) of the Bankruptcy Code. Under Section 727(a)(2)(A), the party seeking denial of a Chapter 7 debtor's discharge must prove the following four elements:

> (1) that the act complained of was done within one year before the petition date; (2) the act was that of the debtor; (3) the act consisted of a transfer, removal, destruction, or concealment of the debtor's property; and (4) the act was done with an intent to hinder, delay, or defraud either a creditor or officer of the estate.

*McDermott v. Petersen (In re Petersen),* 564 B.R. 636, 645 (Bankr. D. Minn. 2017) (citing 11 U.S.C. § 727(a)(2)(A); *Kaler v. Craig (In re Craig),* 195 B.R. 443, 449 (Bankr. D.N.D. 1996)). The elements of Section 727(a)(2)(B) are identical except that the act complained of must have occurred after the petition filing and involves property of the estate. *Id.* at 647.

A history of the title to the 2005 Chevrolet truck was established through a set of documents procured from the Arkansas Department of Finance and Administration and admitted into evidence as Exhibit 9. Various documents in Exhibit 9 refer to the same vehicle, identified by Vehicle Identification Number 2GCEK13T351182185 ("**VIN**"). This is the only VIN referred to by the Exhibit 9 documents.

Elizabeth and Jackson Whitbeck owned the 2005 Chevrolet truck until they sold it to Butterfield Investments in October 2013. (Ex. 9). A duplicate title was issued to Butterfield Investments on July 22, 2016. (Ex. 9). The title was subsequently assigned to Pam or Denny Zulpo with a bill of sale showing a sale date of August 31, 2016. (Ex. 9). A new title was issued and title was transferred to the Zulpos on September 29, 2016. (Ex. 9). The Zulpos then

16

assigned the title to Richter and listed the date of the sale to Richter as June 12, 2016, more than two months prior to the date of the sale from Butterfield to the Zulpos. (Ex. 9).

On November 23, 2016, Richter signed an Affidavit of Non Use, stating that even though thirty days had passed since the date of the transfer of the vehicle to him without his having registered the vehicle, it had not been operated on any street, road or highway in Arkansas. (Ex. 9). The truck was assessed by Richter on the same date, and the Vehicle History List names Richter as owner of the vehicle as of November 23, 2016. (Exs. 46, Ex. 9). A title was issued to Richter on December 12, 2016. (Ex. 9).

Mr. Zulpo testified that the 2005 Chevrolet truck belonged to his stepson, Quinton Richter, who had given Mrs. Zulpo the funds to purchase the vehicle while he was working out of town. Mr. Zulpo stated that when his wife bought the truck, the seller "signed it over to her" so she took possession and then transferred it to Richter because he was, in fact, the owner. (Tr. at 89).

Mrs. Zulpo corroborated Mr. Zulpo's testimony. Although conceding that the motor vehicle records support a conclusion that the Zulpos owned the vehicle at some point, she denied that was the case. She testified that she purchased the truck for her son with his money but she received the title on the vehicle from Butterfield Investments because the seller assumed she was the buyer. She testified that in filling out the sale date to Richter on the back of the title issued September 29, 2016, she "put the June date on there . . . because that's when . . . we first originally started everything." (Tr. at 170).

Other evidence related to the vehicle includes a document titled "SFPP Account Status" generated by State Farm Insurance, Mrs. Zulpo's automobile insurer. (Ex. 18). Dated December 27, 2016, it details the payment history on Mrs. Zulpo's automobile insurance policies

and reflects coverage for the 2005 Chevrolet truck for six months, from July 2016 through December 2016.  (Ex. 18).

When asked about the insurance for a truck the Debtors purport not to own, Mr. Zulpo stated that even though Richter owns the vehicle, the Debtors insure the 2005 Chevrolet truck because they can buy the insurance cheaper than Richter, who is twenty-five and single.  He stated that Richter reimburses them for the cost of the insurance.  However, Richter's assessment of personal property on November 23, 2016, reveals that he assessed, among other vehicles, a 2014 Dodge and a 2016 Chevrolet, neither of which is insured under the Debtors' insurance policies. (Exs. 46, 18).

At the meeting of creditors on December 8, 2016, the Debtors did not mention the transaction involving the 2005 Chevrolet truck, although the subject of the truck did arise.  When the Dantzlers' attorney asked Mr. Zulpo which of the five vehicles listed on the bankruptcy schedules he drives, Mr. Zulpo answered, "The '05 Chevrolet.  It's paid for."  (Ex. 11 at 20). The attorney was confused by the response because no '05 Chevrolet was listed on the schedules and, therefore, he asked, "The—the what?" to which Mr. Zulpo repeated his answer, "05 Chevrolet."  (Ex. 11 at 20).  At that point Mrs. Zulpo interjected, "We don't have an '05 Chevrolet."  (Ex. 11 at 20).

Later in the testimony at the creditors' meeting, counsel asked again, "The black 2005. Who owns that vehicle?" (Ex. 11 at 29).  Mr. Zulpo stammered, "Well, I don't – I didn't say – the white one."  (Ex. 11 at 29).  Counsel then asked, "So you don't drive a black 2005 truck?" (Ex. 11 at 20).  Mr. Zulpo stated in response, "my helper . . . had one . . . that I drove because mine was broke down, but other than that."  (Ex. 11 at 20).

Thus, when counsel asked Mr. Zulpo point blank about the owner of the black 2005 truck at the first meeting, Mr. Zulpo failed to explain that Mrs. Zulpo had recently purchased a 2005 Chevrolet truck and transferred it to her son.  Instead Mr. Zulpo gave an evasive answer.  In testimony at trial, Mrs. Zulpo conceded the Debtors were evasive at the creditors' meeting, but also testified that at the time of the meeting, Mr. Zulpo was borrowing a 2005 Chevrolet pickup belonging to a neighbor, Johnny Hurst, and that was the source of the confusion.  She stated that she and her husband did not disclose a vehicle on loan from Johnny Hurst on their schedules because their attorney's paralegal probably did not use the word "borrowed" when she conferred with them about their Statement of Financial Affairs.  Neither debtor explained why Mr. Zulpo added the irrelevant information "It's paid for" to describe a 2005 Chevrolet pickup he was borrowing from a neighbor.

There was also evidence of the Debtors' continuing use of the 2005 Chevrolet truck after the Debtors assigned title to the 2005 Chevrolet truck to Richter.  Mr. Dantzler submitted into evidence five exhibits, each consisting of a set of photographs he took in August through October of 2017.  Each photograph depicts the exterior of the Debtors' residence on Blue Gill Road with a black Chevrolet pickup truck in the foreground.  (Exs. 37-41).  In each of the photographs taken in August of 2017, the truck bears a sign that says "Stone Work & Repair, Free Estimates" and a telephone number.  (Exs. 37-39).  The photographs taken in September and October 2017 show the same Chevrolet pickup truck but the "Stone Work and Repair" sign is missing.

Mrs. Zulpo did not deny that the Chevrolet pickup truck in the photographs was the same truck she had purchased from Butterfield Investments and transferred to her son.  She stated that her son let her borrow the 2005 Chevrolet truck three or four months prior to the trial on

19

January 8, 2018, so that Mr. Zulpo could work on a project without having to use her truck. She testified that the signs on the 2005 Chevrolet truck are magnetic and are easily removable. She stated that when her husband borrows her son's truck or uses her truck for work, he attaches the signs for advertising purposes.

Considering the testimony and documentary evidence related to the 2005 Chevrolet truck, the Court must conclude that the Dantzlers have proved every element of Section 727(a)(2)(A) as demonstrated in the following discussion.

### (A)  Prepetition Purchase and Transfer

First, the act complained of, concealing an asset, began with the truck purchase, which took place within one year before the filing of the petition as required by Section 727(a)(2)(A). The purchase of the 2005 Chevrolet truck occurred either on June 12, 2016, which Mrs. Zulpo indicated was the sale date on the bill of sale to Richter from Mrs. Zulpo, or on August 31, 2016, the sale date recorded by Butterfield Investments on its bill of sale to the Zulpos. A title was issued reflecting "Pam or Denny Zulpo" as the owners of the 2005 Chevrolet truck on September 29, 2016.

Title to the 2005 Chevrolet truck was assigned to Richter by Mrs. Zulpo by her signature on the assignment portion of the September 29, 2016, title. Mrs. Zulpo back dated the assignment to June 12, 2016. Mrs. Zulpo explained she used the June date because that is when everything started. She stated she lost the original title given to her by Butterfield Investments and that Butterfield had to apply for and give her another title. The Debtors stated in their Answer that they transferred title to the vehicle to Richter "shortly after acquiring it." (Answer ¶ 9). The 2005 Chevrolet truck was not listed on the Debtors' State Court Schedules of Assets dated October 11, 2016, filed in the State Court Lawsuit, nor in the Debtors' schedules filed in

their bankruptcy case on November 8, 2016.  (Exs. 2, 5).  Although Richter did not apply for the title to be reissued in his name until November 23, 2016, and title was not reissued in his name until December 12, 2016, both dates being after the bankruptcy was filed, the weight of the evidence supports a finding that both the Debtors' purchase of the 2005 Chevrolet truck and their assignment of their interest in the 2005 Chevrolet truck to Richter occurred within one year before the petition date of November 3, 2016, within the time period required by Section 727(a)(2)(A).

**(B)  Act of the Debtors**

Second, the act complained of was an act of the Debtors.  They testified they purchased the 2005 Chevrolet truck for Richter using his funds, they are listed as the buyers of the property by Butterfield Investments, the Debtors were issued a title to the 2005 Chevrolet truck, Mrs. Zulpo is shown as the seller to Richter on the back of the title, and Mrs. Zulpo  assigned the title to Richter.

**(C)  Concealment**

Third, the act consisted of a concealment of the Debtors' property.  Concealment, unlike the other proscribed actions in the statute, is a continuing event.  *In re Craig,* 195 B.R. at 449. The general definition of concealment is "the transfer of legal title to property to a third party with the retention of a secret interest by the Bankrupt."  *Sears v. Sears,* 863 F.3d 980, 984 (8th Cir. 2017).  Asset concealment exists "'where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of the property continued.'"  *In re Petersen*, 564 B.R. at 645 (quoting *In re Korte,* 262 B.R. at 472).

 In the instant case, after the truck was sold to the Debtors, a title was issued to them on September 29, 2016.  On November 23, 2016, Richter signed an Affidavit of Non Use, stating

that even though thirty days had passed since the date of the transfer of the vehicle to him without his having registered the vehicle, it had not been operated on any street, road or highway in Arkansas.  The Vehicle History List names Richter as owner of the vehicle as of November 23, 2016, and title was issued to him on December 12, 2016.

Despite these various occurrences, the Debtors did not list the truck on their schedules as property of the estate or, under their version of events, list it on the Statement of Financial Affairs as property they transferred prepetition.  The Dantzlers might never have known about the existence of the truck purchase had Mr. Zulpo not inadvertently disclosed at the creditors' meeting on December 8, 2016, that he drove a "paid for" 2005 Chevrolet, a vehicle not listed on the schedules or in the Statement of Financial Affairs.  Particularly suspicious at the creditors' meeting was the fact that the Debtors attempted to cover Mr. Zulpo's blunder with an explanation that Mr. Zulpo had gotten confused because a neighbor or helper had such a truck, which Mr. Zulpo sometimes borrowed.

Mr. Zulpo's inadvertent admission that he drove the 2005 Chevrolet is evidence that the Zulpos retained the benefit and use of the truck despite the fact that they continued to conceal that interest from their creditors and had transferred title to Richter.  From the record it appears that it was not until the Dantzlers filed this adversary proceeding that they finally admitted that they had bought and transferred a 2005 Chevrolet truck to Richter prepetition.  If the original transaction had truly been a mere accommodation for their son, the time to set the record straight was at the creditors' meeting where they were testifying under oath.

### (D)  Intent to Hinder, Delay or Defraud

Fourth, as the following discussion will detail, the evidence demonstrates that the concealment was done with an intent to hinder, delay, or defraud either a creditor or officer of

22

the estate.  Courts have recognized the difficulty in proving actual fraudulent intent by direct evidence, but have held that such intent may be inferred "'from the facts and circumstances of the debtor's conduct.'"  *Helena Chemical Co. v. Richmond (In re Richmond),* 429 B.R. 263, 304 (Bankr. E.D. Ark. 2010) (quoting *In re Korte,* 262 B.R. at 473).

Such facts and circumstances are most commonly referred to as "badges of fraud."  *Luker v. Eubanks (In re Eubanks),* 444 B.R. 415, 422-23 (Bankr. E.D. Ark. 2010) (citing *In re Richmond,* 429 B.R. at 305).  Courts generally require a "confluence" of several badges of fraud for a presumption of fraudulent intent to arise.  *Id.* (citing *Kelly v. Armstrong,* 206 F.3d 794, 798 (8th Cir. 2000) and *City Nat'l Bank of Fort Smith v. Bateman (In re Bateman),* 646 F.2d 1220, 1223 (8th Cir. 1981)).  The existence of a single badge of fraud is insufficient to establish fraudulent intent.  *In re Eubanks,* 444 B.R. at 422.  However, if the presumption arises, the burden of production shifts to the debtor to show a "'legitimate supervening purpose'" of the transfer.  *Id.* at 423 (quoting *Armstrong,* 206 F.3d at 798).

The phrase "intent to hinder, delay, or defraud" is repeated in several Bankruptcy Code provisions, including Section 727(a)(2) (objection to discharge), Section 548(a)(1)(A) (trustee's avoidance of fraudulent transfers), and Section 522(o) (limiting exemptions in fraudulently transferred property).  Courts have applied the inferential "badges of fraud" approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.  *In re Richmond,* 429 B.R. at 304 (construing Section 727(a)(2)); *In re Eubanks,* 444 B.R. at 422-23 (construing Section 548); *Addison v. Seaver (In re Addison),* 540 F.3d 805, 811-12 (8th Cir. 2008) (construing Section 522(o)).

In the case of *In re Richmond*, the court detailed a list of eleven[7] indicia to consider when determining whether a debtor acted with the intent to hinder, delay, or defraud for purposes of Section 727(a)(2). *In re Richmond,* 429 B.R. at 305 (citing *First State Bank of Munich v. Braathen (In re Braathen),* 364 B.R. 688, 697 (Bankr. D.N.D. 2006)).

Of the eleven considerations listed in *Richmond*, the following circumstances are relevant to the instant case: the relationship between transferor and transferee; retention of possession, benefit or use of the property in question; secrecy of the conveyance; the existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; and general chronology of events and transactions under inquiry. *In re Richmond,* 429 B.R. at 305. Each will be addressed in turn.

First, a familial relationship exists between the Debtors and Richter, the transferee. He is the adult son of Mrs. Zulpo, and she claims to have been purchasing the truck for him with his funds because he was out of town for work and not available to complete the transaction himself. Mrs. Zulpo did not explain why it was so urgent to purchase the truck while Richter was out of town instead of waiting until he returned from a work assignment to purchase the truck himself. Richter did not testify at the trial to corroborate the story.

---

[7] The eleven factors are:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

*In re Richmond*, 429 B.R. at 305.

Additionally, the Debtors appear to be retaining the benefit, use, or possession of the truck.  Although the Debtors allege that Richter owns the 2005 Chevrolet truck, the Debtors do not deny using it with some frequency for business purposes.  The photographs of the 2005 Chevrolet truck showed it was parked at the Debtors' residence in the early morning hours on five different days from August 1 to October 31, 2017, indicating continuing use of the vehicle.  On several of those occasions it bore the Debtor's stone mason magnetic sign and on one occasion the bed of the truck contained a wheel barrow, a piece of equipment the Debtors use in their stone mason operation.  Mrs. Zulpo's explanation was that her husband borrowed the 2005 Chevrolet truck for a period of time to use for work.  At the very least, the photographs evidence that the Debtors frequently have possession and control over the truck.

Moreover, buying insurance for an automobile is a necessary incident to ownership, and the Debtors, not Richter, insure the truck. The evidence revealed that for six months, both before and after the bankruptcy filing in 2016, Mrs. Zulpo insured the 2005 Chevrolet truck.  She testified she insures the truck for her son and he reimburses her because she can get a less expensive premium rate.  However, Richter's personal property assessment dated November 23, 2016, shows Richter assessed several vehicles, boats, and trailers that the Debtors did not insure.

Also important in showing the existence of intent to defraud by concealment is a course of conduct engaged in by the Debtors that is related to the State Court Lawsuit, which was filed in 2014, tried on June 8, 2016, and concluded by a judgment against the Debtors on July 12, 2016.  This badge of fraud will be considered in tandem with the chronology of relevant events surrounding the State Court Lawsuit and subsequent bankruptcy.

 After the suit was filed, the Debtors took actions to insulate their personal property from the Dantzlers' collection efforts if the Debtors were to lose the case.  Two Pulaski County

25

Personal Property Assessments by Mrs. Zulpo, both dated May 31, 2016, evidence an intent to create a false impression that the Debtors owned no personal property valuable enough to help satisfy a judgment.  (Exs. 15, 44).  The assessments occurred between January 1 and May 31, 2016, which is after the State Court Lawsuit was filed in 2014 but prior to the trial and entry of judgment.

Exhibit 15 is the property assessment for property subsequently listed as assets in the Debtors' bankruptcy.  This property included the same five vehicles, boats and motors, and the trailers that are reflected on the Debtors' Schedule A/B and listed as exemptions under Schedule C.  (Exs. 5, 15).[8]  The assessment reflects that except for the Mercury Mystique and the 1981 Ford truck, each piece of property bears the notation "Final 5/31/2016."  (Ex. 15). Exhibit 44 is another 2016 personal property assessment by Mrs. Zulpo with an account number, assessment date, and comments beneath the heading that are identical to the first property assessment.  (Ex. 44).  However, the second property assessment lists only the Mercury Mystique and the 1981 Ford pickup truck as personal property to be assessed, neither of which is in working condition, according to Mr. Zulpo's testimony.

Richter's personal property assessment, dated November 23, 2016, reflects most of the property removed from Mrs. Zulpo's first May 31, 2016 assessment.  (Ex. 46).  Of the property described as "final" and removed from Mrs. Zulpo's first May 31, 2016 assessment, only the 1970 Duracraft boat and Evinrude motor and the 2011 utility trailer have not been transferred to Richter's November 23, 2016 personal property assessment.  (Exs. 15, 46).

---

[8] The list includes a 1999 Mercury Mystique, 1981 Ford Pickup, 2003 Dodge 1500, 1973 Ford Pickup, 2001 Chevrolet 1500, 1970 Evinrude motor, 1995 Fuliner boat, 1974 Duracraft boat, 1970 Duracraft boat, 1965 boat trailer, and 2011 homemade utility trailer.

None of the items formerly assessed by Mrs. Zulpo on May 31, 2016, had been previously assessed by Richter, as evidenced by his January 21, 2015 personal property assessment. (Ex. 45). Richter's 2017 personal property assessment dated June 7, 2017, also reflects the same items that were formerly assessed by Mrs. Zulpo on May 31, 2016. (Ex. 47). The comments to Richter's 2017 personal property assessment state, "6/7/2017/PKB: In office per assessed by Pam Zulpo (Mom) assessed w/ penalty." (Ex. 47). The 2005 Chevrolet truck had not been listed on either of the Debtors' assessments in May of 2016, but it was reflected for the first time on Richter's November 23, 2016 assessment, the same date he registered the vehicle.

Related to the shifting of assets between property assessments, the Zulpos did not list ownership in any vehicles in their State Court Schedules of Assets, including the 2005 Chevrolet truck or the personal property removed from their May 31, 2016, assessment. In a subsequent order entered October 17, 2016, the circuit court questioned the completeness and veracity of the Zulpos' State Court Schedules of Assets and ordered them to supplement the schedules within twenty days. (Ex. 43).

Instead of filing supplements, the Debtors filed for bankruptcy on November 3, 2016. In their schedules filed on November 8, 2016, they listed their ownership interest in the personal property they had previously shifted from their property assessment to that of their son, but they did not list the 2005 Chevrolet truck on their schedules. Once under the protection of the Bankruptcy Code, the Debtors exempted the same property that was then being assessed under Richter's name. The property has remained on Richter's 2017 tax assessment, along with the 2005 Chevrolet truck, as evidenced by Richter's 2017 personal property assessment. (Ex. 47).

The Debtors' attempts to hide their interests in the various pieces of personal property by manipulating the property assessments establishes a pattern of deceit or fraudulent course of conduct with respect to the state court judgment.  That course of conduct encompasses the 2005 Chevrolet truck as well.  The Court infers the purchase of the 2005 Chevrolet truck occurred around the time of the trial on June 8, 2016, consistent with the Debtors' representations about the date of the sale on June 12, 2016.  Like their other personal property, the Debtors were attempting to conceal their ownership of the truck so it would not be subject to a judgment in the State Court Lawsuit.

 The Court concludes that the facts and circumstances discussed above establish a conflation of five of the badges of fraud or indicia of fraud commonly used to prove intent to hinder, delay, or defraud creditors.  The Debtors' continuing concealment of their possessory interest in the 2005 Chevrolet truck was done with intent to hinder, delay, or defraud their creditors, beginning with concealment in the face of a judgment and continuing throughout the bankruptcy case.

### (E)  Debtors' Burden of Proof – Legitimate Supervening Purpose

The burden now shifts to the Debtors to produce a legitimate supervening purpose for the transfer of the property to overcome the presumption that their concealment was done with intent to defraud.  *In re Eubanks,* 444 B.R. at 423 (quoting *Armstrong,* 206 F.3d at 798).

The Debtors never produced evidence to substantiate their allegation that their son provided the purchase money for the truck or that the truck was meant for his use and not theirs. They never explained with any credibility why, if Richter bought the property, he was not shown as the buyer on the bill of sale from Butterfield.  Nor did they attempt to explain why they

transferred vehicles, boats, motors, and trailers to Richter prior to judgment being entered in the State Court Lawsuit.

Moreover, the Debtors gave conflicting testimony regarding their vehicle ownership at the January 2018 trial. Mr. Zulpo stated that he drove the 2001 Chevrolet and Mrs. Zulpo drove the 2003 Dodge and that of the five vehicles listed on their schedules, these were the only two automobiles that were operational. Mr. Zulpo further testified that four or five months prior to the trial, the Debtors had sold the 2003 Dodge to pay attorney's fees but that he still drives the 2001 Chevrolet. He did not disclose the buyer of the 2003 Dodge, but it is listed on Richter's 2017 personal property assessment.

Contradicting that testimony, Mrs. Zulpo testified that Mr. Zulpo borrows the 2005 Chevrolet truck from Richter so that he does not have to use her 2003 Dodge for work, implying that at the time of trial the Debtors still owned the 2003 Dodge, but also that Mr. Zulpo has no vehicle other than the 2003 Dodge or the 2005 Chevrolet to use for work. Their conflicting stories coupled with the other acts of concealment in this case lead the Court to conclude that the Debtors' statements lack credibility.

The Debtors having failed to produce evidence to rebut the presumption of fraudulent intent, the Court finds that the Dantzlers have proved each of the four elements of concealment with intent to defraud under Section 727(a)(2)(A), and the Debtors' discharge will be denied on that basis.

Having denied the Debtors' discharge under Section 727(a)(2)(A), the Court declines at this time to consider whether the Debtors' discharge should also be denied under Section 727(a)(2)(B).

## VI.  Section 727(a)(4) – False Oaths

The Dantzlers allege in their complaint that the Debtors have repeatedly and knowingly made false oaths or accounts on the bankruptcy petition, schedules, Statement of Financial Affairs, and sworn testimony at the first meeting.  They argue, therefore, that the Debtors' discharge should be denied pursuant to Section 727(a)(4) of the Bankruptcy Code.

They allege that the following instances of inaccuracies and omissions constitute false oaths by the Debtors: failing to acknowledge they operate a business; stating their debts were primarily consumer debts; asserting they are joint owners of the property on Blue Gill Drive in Roland, Arkansas; concealing an interest in 2.1 acres of real estate on Julio Road in Pulaski County, Arkansas (the "**Julio Road Property**"); concealing ownership and/or transfer of the 2005 Chevrolet truck; omitting ownership of electronics; omitting equipment used in a business or trade; inaccurately stating taxes owed for personal property and income; failing to disclose a transfer of a 2001 Dodge 2500 truck; and testifying falsely about their previous bankruptcies.

The Debtors' attorney addressed each of these instances of false oaths in the answer to the complaint.  He further stated at trial that the Debtors have tried to be truthful and explain discrepancies but they did not always understand the meaning of a question posed to them and trusted their attorney to represent the information they provided in the proper way.  He added that even if all the information omitted from the schedules had been included, the resulting payout to creditors would not change.

The applicable statute provides that a discharge will be granted unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A) (2012).  This provision helps to ensure "'full and complete disclosure of any and all apparent interests of any kind.'"  *In re Korte,* 262 B.R. at 474 (quoting *Fokkena v.*

*Tripp (In re Tripp),* 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)). "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Cepelak v. Sears (In re Sears),* 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)).

Under Section 727(a)(4)(A), the plaintiff must prove five elements: (1) "'the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the Debtor's bankruptcy case.'" *In re Charles*, 474 B.R. at 684 (quoting *Lincoln Sav. Bank v. Freese (In re Freese),* 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011)). Each element will be addressed in turn.

**(A) Debtors' Oaths**

A debtor's schedules and statements filed in his bankruptcy case are signed under penalty of perjury and, therefore, constitute oaths for purposes of Section 727(a)(4)(A). Similarly, a debtor's testimony at the meeting of creditors is given under oath. *In re Charles*, 474 B.R. at 684.

The evidence presented at trial demonstrates that each of the Debtors signed the joint bankruptcy petition, schedules, and statements under penalty of perjury. (Exs. 4, 5, 6, 11). Furthermore, they swore to tell the truth at their meeting of creditors on December 8, 2016. (Ex. 11 at 3). At their meeting of creditors, the Debtors said they knew that they had prepared and signed the schedules and Statement of Financial Affairs under oath. (Ex. 11 at 10). They also stated they believed all the testimony given at the meeting of creditors was true and correct. (Ex. 11 at 39).

The Court finds that each instance of false statement detailed in the Dantzlers' complaint relates to information either supplied or incorrectly omitted by the Debtors in their bankruptcy schedules and statements or to statements made by the Debtors at the meeting of creditors.  As such, the Dantzlers have demonstrated that the instances complained of were made under an oath or account as required by the statute.

### (B) False Statements

The Dantzlers allege that notwithstanding the Debtors' oaths to tell the truth, their testimony at the first meeting and the Debtors' information in their bankruptcy filings reflect numerous false statements knowingly made by the Debtors.  They argue that many of the discrepancies in the schedules came to light at the first meeting of creditors but the Debtors failed to correct their bankruptcy filings, forcing the Dantzlers to file an adversary proceeding. The Dantzlers further contend that even though many of the misrepresentations are relatively minor, the overwhelming number of them evidence a lack of honest effort, a disregard for their oaths, and an intent to mislead and conceal.

At trial, Mr. Zulpo acknowledged signing his petition, stating that his attorney explained to him that it was important to give accurate information.  Although Mrs. Zulpo is the bookkeeper in the family, Mr. Zulpo stated that he understood that both he and his spouse were equally responsible for supplying correct information.  According to Mr. Zulpo's testimony, both of the Debtors supplied the information required by the bankruptcy petition.

 Mrs. Zulpo testified that when the Debtors were preparing to file for bankruptcy, their counsel's employee read the questions from the various bankruptcy forms to the two of them, and she and her husband then supplied the required information while the employee entered the information into a computer program.  She stated that she understood that her answers were

given under penalty of perjury but also admitted that now she knows her statements and schedules contain inaccuracies.

In addition to inaccuracies, an omission of an asset can constitute a false oath. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)). The Court has reviewed the inaccuracies and omissions complained of by the Dantzlers and must agree that in each instance, the information provided by the Debtors is false.

### (C) Material False Oaths Made Knowingly and Fraudulently

The third, fourth, and fifth elements of the statute require that the false oaths were made knowingly and with fraudulent intent, and that they relate materially to the bankruptcy case. These three elements require an inquiry into the particular circumstances surrounding each of the false oaths before a debtor's discharge will be denied.

The elements of knowing a statement is false and making the statement with fraudulent intent must be separately proven. *Merena v. Merena (In re Merena)*, 413 B.R. 792, 815-16 (Bankr. D. Mont. 2009). The term "knowingly" requires that the debtor acted deliberately and consciously. *Id*. at 816.

The intent element in the false oath provision is broader than that applied under Section 727(a)(2)(A) because the objects of the fraud are not limited to creditors or officers of the estate. 6 COLLIER ON BANKRUPTCY ¶ 727.04 [1][a] (Richard Levin & Henry J. Sommer eds., 16th ed.). Fraudulent intent under the false oath provision can be established by circumstantial evidence, and "'statements made with reckless indifference to the truth are regarded as intentionally false.'" *In re Korte*, 262 B.R. at 474 (quoting *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)). The Dantzlers argued at trial that the sheer magnitude of inaccuracies and omissions amount to proof of the Debtors' intent to deceive. They further

33

contended that the Debtors' failure to amend their false schedules after the meeting of creditors and after they received the exhibits to be presented at trial also prove fraudulent intent as to many of the allegations in the complaint.

In applying this statute the Court recognizes that false oaths are not fraudulent *per se*. "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence . . . [and] an honest error or mere inaccuracy is not a proper basis for denial of discharge." *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1294-95 (10th Cir. 1997) (citing *Nat'l Bank of Pittsburg v. Butler (In re Butler),* 38 B.R. 884, 889 (Bankr. D. Kan. 1984) and *Drewes v. Magnuson (In re Magnuson),* 113 B.R. 555, 559 (Bankr. D.N.D. 1989)); *see also In re Craig*, 195 B.R. at 451 ("mere carelessness or sloppy schedule preparation without attendant fraudulent intent will not support an action under § 727(a)(4)" (citing *Garcia v. Coombs (In re Coombs),* 193 B.R. 557 (Bankr. S.D. Cal. 1996))).

The Court will first apply the three remaining statutory elements to the three omissions focused on at trial by the Dantzlers: the Julio Road Property, the 2005 Chevrolet truck, and the 2001 Dodge 2500.

### (1) *Julio Road Property*

The Dantzlers alleged in their complaint that the Debtors failed to disclose Mr. Zulpo's interest in the Julio Road Property that he jointly owns with his father, Julio J. Zulpo. Counsel for the Debtors argued that Mr. Zulpo believed he would inherit the Julio Road Property from his father after the death of both his father and stepmother but did not understand he held a present ownership interest to disclose on his bankruptcy petition.

The Debtors did, however, disclose an ownership interest in the Julio Road Property to the Circuit Court of Pulaski County less than a month prior to the Debtors' bankruptcy filing in

Mr. Zulpo's State Court Schedule of Assets.  (Ex. 2).  Mr. Zulpo's State Court Schedule of Assets listed assets consisting of cash on hand, two bank accounts, and real estate at 18801 Julio Road in Roland, Arkansas, described as a "Joint intrest [sic] with Father Julio Zulpo After Father's Death."  (Ex. 2).

Twenty-three days after submitting this State Court Schedule of Assets to the circuit court, the Debtors filed for bankruptcy on November 3, 2016.  (Ex. 3).  On their schedules and Statement of Financial Affairs filed five days later on November 8, 2016, the only real estate interest disclosed by their bankruptcy Schedule A/B was in the property at 25120 Blue Gill Drive where the Debtors currently reside.  (Ex. 5).

At the meeting of creditors on December 8, 2016, the Debtors denied owning any real estate other than that listed in the schedules and also denied receiving a deed to the Julio Road Property from Mr. Zulpo's father.  (Ex. 11 at 29).

At trial on January 8, 2018, the Dantzlers introduced a copy of a warranty deed in which the grantor, Julio J. Zulpo, conveyed approximately 2.1 acres of land in Pulaski County, Arkansas, to himself and Denny Ray Zulpo as joint tenants with right of survivorship.  The deed reserves a life estate in Betty Faye Zulpo, Julio Zulpo's wife.  (Ex. 12).  It was signed on August 9, 2011, by Julio and Betty Zulpo and by the Debtor, Denny Ray Zulpo.  (Ex. 12).

Mr. Zulpo testified at trial that he did not list the Julio Road Property on his bankruptcy schedules because it will not belong to him until his father and stepmother pass away.  He admitted that at the creditors' meeting he did not disclose the fact that he could inherit the property.  His explanation was that he did not disclose the interest because he was not asked about it.  He said after conferring with his attorney he came to understand that the deed conveyed

to him a present interest in the property but that was not his understanding when he filed his bankruptcy schedules.

Mrs. Zulpo testified that she prepared the State Court Schedules of Assets for her husband and herself, and she listed the Julio Road Property on his State Court Schedule of Assets. Each debtor signed his or her separate State Court Schedule of Assets under oath. (Ex. 2). Mrs. Zulpo admitted that Mr. Zulpo's interest in the property was disclosed in his State Court Schedule of Assets but not on the subsequently filed bankruptcy schedules. Like her husband, she testified that she had been confused about whether Mr. Zulpo held a present joint interest in the Julio Road Property, but had learned since their bankruptcy filing that he did.

The Debtors did not, however, appear to be confused about whether to disclose Mr. Zulpo's interest in the property when they submitted his State Court Schedule of Assets filed twenty-eight days *prior* to omitting the property from the bankruptcy schedules. From this circumstance, the Court draws the inference that the Debtors knew the property was an asset to be disclosed in their bankruptcy case but that they intended to conceal it so that it would not be administered for the benefit of creditors. Thus, the Court concludes the Debtors made false oaths regarding the property in both their meeting of creditors and in Schedule A/B of their bankruptcy schedules, and they did so knowingly and fraudulently.

Furthermore, the fact that the property was not disclosed in the bankruptcy schedules is an omission that relates materially to the Debtors' bankruptcy case. Courts have found "[t]he threshold to materiality is fairly low: 'The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of

his property.'"  *In re Sears,* 246 B.R. at 347 (quoting *Chalick v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir. 1984)).

In the instant case, Mr. Zulpo holds a joint tenancy with right of survivorship in the Julio Road Property.  Generally, "[a] joint tenancy is a present estate in which *both* joint tenants are seized of the real estate."  *First Nat'l Bank & Trust Co. of Rogers v. Estate of Hummel,* 25 Ark. App. 313, 316, 758 S.W.2d 418, 420 (1988) (citing *Miller v. Riegler,* 243 Ark. 251, 419 S.W.2d 599 (1967)).  Whether the particular conditions placed on this conveyance by Mr. Zulpo's father change the nature of the conveyance to that of a testamentary disposition is a matter to be examined by the trustee and the creditors in this bankruptcy.  *See, e.g.*, *Ransom v. Ransom,* 202 Ark. 123, 149 S.W.2d 937, 939 (1941) (discussing the difference between a deed as a present conveyance and a deed used as a testamentary disposition).  Questions about whether assets are or are not property of the estate are issues for the trustee or the court, not the debtor, to decide. *Home Serv. Oil Co. v. Cecil (In re Cecil),* 542 B.R. 447, 454-55 (B.A.P. 8th Cir. 2015).  The Debtors' failure to disclose this interest precluded an investigation into the nature of the property.  The subject matter of the false oath concerns discovery of an asset, and, as such, is material.

For the foregoing reasons, the Debtors' discharge will be denied for omitting the Julio Road Property from their schedules and giving false testimony related to the property at the meeting of creditors.

### (2)  2005 Chevrolet Silverado Truck

The Court has determined that the Debtors' discharge will be denied pursuant to Section 727(a)(2)(A) because the 2005 Chevrolet truck was fraudulently concealed.  Additionally, the

Dantzlers argue that the Debtors' failure to disclose the truck and its transfer amounts to a false oath pursuant to Section 727(a)(4).

Despite having purchased and receiving title to the 2005 Chevrolet truck a few months prior to their bankruptcy filing, the Debtors did not disclose their ownership on their bankruptcy schedules. (Ex. 5). They have alleged they purchased the truck for Mrs. Zulpo's son, Quinton Richter, using his funds for the purchase, but the property was not shown to have been transferred to Richter as required by Question 18 of the Debtors' Statement of Financial Affairs. (Ex. 5, Statement of Financial Affairs, Question 18).

Furthermore, the Debtors denied holding or controlling any property that someone else owns, including property they might have borrowed. (Ex. 5, Statement of Financial Affairs, Question 23). Additionally, the Debtors did not disclose that they gave any gifts totaling more than $600.00 per person during the two years prior to bankruptcy. (Ex. 5, Statement of Financial Affairs, Question 13). They also failed to disclose their purchase of the truck and its transfer at the meeting of creditors. (Ex. 11).

Through this proof and other facts adduced pursuant to their claim under Section 727(a)(2)(A), the Dantzlers have established that the Debtors have made multiple false statements under oath regarding the 2005 Chevrolet truck and that the statements, being deliberate and intentional, were knowingly made. The Debtors have never wavered from their story that the 2005 Chevrolet truck belongs to Richter, despite all the evidence to the contrary. Their consistency, in this instance, proves they deliberately and intentionally omitted mention of the 2005 Chevrolet truck from the schedules.

The Court has recognized numerous badges of fraud in connection with finding that the Debtors concealed the 2005 Chevrolet truck with intent to defraud creditors. These same badges

of fraud establish that the Debtors made false oaths with fraudulent intent.  *In re Merena,* 413

B.R. at 815 (badges of fraud may establish the necessary intent to make a false oath) (citing

*Fogal Legware of Switz., Inc. v. Wills (In re Wills),* 243 B.R. 58, 64 (B.A.P. 9th Cir. 1999)).

Moreover, the omission is material to the bankruptcy case in that it bears a relationship to

the Debtors' estate and concerns the discovery of assets.  The trustee in the case, among others,

should have been made aware of the circumstances surrounding the 2005 Chevrolet truck to

determine whether the purported transfer could have been avoided and the asset liquidated for

the benefit of creditors.

The Dantzlers having proved each of the five elements constituting false oaths as they

relate to the 2005 Chevrolet truck, the Debtors' discharge is denied.

### (3)  *2001 Dodge 2500 Truck*

On their Statement of Financial Affairs, the Debtors stated that during the two-year

period before the bankruptcy filing, they did not transfer any property to anyone other than in the

ordinary course of business.  (Ex. 5, Statement of Financial Affairs, Question 18).  Similarly, at

their meeting of creditors they stated in response to questioning that they had not transferred any

real or personal property in the past three years.  (Ex. 11 at 5).

However, the Debtors' personal property assessments reflect that they assessed a 2001

Dodge 2500 truck in 2014 and 2015 but not in 2016. (Exs. 13, 14 & 15).  Furthermore, the

Debtors paid State Farm Mutual Automobile Insurance Company for an insurance policy on a

2001 Dodge 2500 for coverage from October 14, 2015 to April 14, 2016.  (Ex. 16).  The Debtors

did not list ownership of a 2001 Dodge truck on their Schedule A/B.  (Ex. 5).

The Dantzlers argue that the Debtors either transferred the truck within the two-year

period or they still own the vehicle but did not disclose it on Schedule A/B.  Thus, according to

the Dantzlers, either the Debtors' Schedule A/B or their testimony at the meeting of creditors and answer on the Statement of Financial Affairs constitute false oaths regarding this property.

At the trial, Mr. Zulpo testified somewhat tentatively that they sold the truck "a couple of years ago" prior to the bankruptcy filing. (Tr. at 63). Mrs. Zulpo stated on direct examination that the truck was sold for $500.00 sometime prior to bankruptcy when the weather was warm. She further testified that the Debtors had purchased the truck from her deceased father's estate, that her husband had subsequently wrecked it, and that it was "all bashed in on the right-hand side." (Tr. at 180). Upon cross examination, she stated that the sale date "could be two [years] or more, truthfully" prior to bankruptcy. (Tr. at 180).

The Dantzlers have established through the property assessments and insurance policy that the Debtors maintained an interest in the 2001 Dodge truck within the two-year period prior to bankruptcy. Both Debtors agreed the truck was sold prior to bankruptcy and Mrs. Zulpo speculated that it could have been sold two years before bankruptcy. Neither testified regarding whether the truck was sold prior to three years before bankruptcy, pursuant to the question posed at the meeting of creditors.

Considered together, the 2015 property assessment, the insurance policy for October 2015 to April 2016, and a lack of any explanation regarding these two pieces of evidence convince the Court that the Debtors owned the property at some point in 2015 and sold it in that year. Accordingly, the Debtors' assertions on the Statement of Financial Affairs and at the meeting of creditors were false statements because the transfer of the truck within the two-year prepetition period was not disclosed.

The issue remains, however, whether the omission of the transfer was done by mistake or inadvertence rather than knowingly and with the intent to defraud or with reckless indifference.

Unlike the numerous badges of fraud that characterize the concealment of the 2005 Chevrolet truck, discussed above, there are no circumstances or course of conduct surrounding the transfer of the 2001 Dodge truck or its omission from the bankruptcy schedules and statements to indicate knowing omission with fraudulent intent.

That being the case, it is unnecessary for the Court to discuss the issue of whether the omission of the transfer was material to the bankruptcy. The Dantzlers have failed to carry their burden of proof as to whether the omission of this piece of property warrants denial of discharge for false oath.

### (4)  *Other Omissions and Inaccuracies*

The Dantzlers allege that numerous other inaccuracies and omissions in the bankruptcy schedules and statements and at the meeting of creditors constitute false oaths by the Debtors. The Court has examined each of these and found that each allegation does involve inaccuracies or omissions that were stated or submitted under oath by the Debtors.

However, it must also be established that the Debtors knew such oaths were false, that their oaths were made with fraudulent intent, and that the subject matter of the oath is material to the bankruptcy case. At trial where the Debtors attempted to explain these false statements, their explanations often reflected carelessness, inadvertence, mistake, or miscommunication, but not fraud. Closely analyzing each remaining allegation for proof of every element would unduly lengthen this opinion and is unnecessary, the Court having already denied the Debtors' discharge for failing to keep and preserve records, concealing property with intent to defraud, and making false oaths regarding two omissions. For the same reason, the Court declines to conclude that the sheer number of inaccuracies and omissions is proof that the Debtors knew their statements were false and that they made them with fraudulent intent.

## VII.  Conclusion

For the foregoing reasons, the Dantzlers have carried their burden of proof and their objection to the Debtors' discharge is sustained.  The Debtors failed to keep and preserve records from which their financial condition could be ascertained, concealed the purchase and transfer of the 2005 Chevrolet truck with intent to defraud the trustee and creditors, and knowingly and fraudulently made material false oaths in connection with the bankruptcy case.

Therefore, the Debtors' discharge is denied pursuant to Section 727(a)(3), Section 727(a)(2)(A),and Section 727(a)(4).

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  09/27/2018

42